TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00475-CV






Texans Uniting for Reform and Freedom, Appellant


v.


Amadeo Saenz, Jr., P.E., Individually and in his Official Capacity as Executive Director

of the Texas Department of Transportation; Coby Chase, Individually and in his

Official Capacity as Director of the Texas Department of Transportation Government

and Public Affairs Division; Texas Department of Transportation;

and Texas Transportation Commission, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT

NO. D-1-GN-07-003165, HONORABLE PAUL DAVIS, JUDGE PRESIDING




C O N C U R R I N G O P I N I O N



 In this interlocutory appeal, appellant Texans Uniting for Reform and Freedom
("TURF") challenges the trial court's order granting the plea to the jurisdiction filed by appellees
Amadeo Saenz, Jr., P.E., individually and in his official capacity as Executive Director of the Texas
Department of Transportation; Coby Chase, individually and in his official capacity as Director of
the Texas Department of Transportation Government and Public Affairs Division; Texas Department
of Transportation; and Texas Transportation Commission ("TxDOT"). On this record and these
pleadings, I concur in the majority's judgment affirming the trial court's order granting the plea to
the jurisdiction.


Background

 TURF is a non-profit organization whose stated mission is "to educate the public
about and organize the public against TxDOT's new shift to tolling as the primary method to finance
road construction." In 2007, TURF filed suit against TxDOT seeking to enjoin the use of public
money for a political and lobbying campaign. (1) TURF's pleadings alleged that TxDOT's expenditure
of public funds for the "Keep Texas Moving" campaign amounted to lobbying and engaging in
political activities by a state agency in violation of chapter 556 of the government code. TURF
sought declaratory and injunctive relief. See Tex. Gov't Code Ann. §§ 556.001-.009 (West 2004).

 Included among the allegations in TURF's petition were the following assertions:



 TxDOT launched a political campaign called "Keep Texas Moving"
("KTM") in an attempt to advocate a public policy of tolling most roads
in Texas.

 TxDOT has sought to influence this political issue with its KTM campaign.

 Unlike purely educational efforts such as the "Don't Mess With Texas"
campaign, the KTM campaign is a one-sided attempt to advocate one
political point of view on a highly controversial matter that is far from
politically decided.

 TxDOT has hired lobbyists and openly lobbied local, state and federal
officials in support of TxDOT's desire to toll existing federal interstate
highways and other tolling initiatives that are not yet in development.

 [T]he KTM campaign and the lobbying campaign constitute state-agency
sponsored political advocacy and lobbying that are prohibited by § 556.001
et seq. of the Texas Government Code and 5 U.S.C. [§] 1501 et seq.



 TxDOT filed a plea to the jurisdiction, and TURF filed a motion for continuance. On
October 18, 2007, the trial court granted a 90-day continuance. The hearing on TxDOT's plea to the
jurisdiction was ultimately held on March 20, 2008. During the intervening period, the parties
amended their pleadings (2) and conducted discovery. As part of this discovery, TURF conducted
depositions of four TxDOT employees--Executive Director Amadeo Saenz, Director of the
Government and Public Affairs Division Coby Chase, Helen Havelka, and Ted Houghton. In
support of the allegations in its petition, TURF submitted evidence to the trial court, including
excerpts from these depositions, multiple affidavits from TURF's Executive Director Terri Hall,
printouts from the Keep Texas Moving website, and other documents to support the allegations in
its pleadings. TxDOT also submitted evidence in support of its plea to the jurisdiction, including
excerpts from depositions of Mr. Chase and Ms. Havelka, and an affidavit from Ms. Havelka.

 On the morning of March 20, 2008, prior to the hearing on TxDOT's plea to the
jurisdiction, TURF filed another motion for continuance seeking additional time for discovery. The
trial court denied TURF's motion for continuance and took the plea to the jurisdiction
under advisement. After the hearing, TURF filed a motion to supplement the record to include the
"Fourth Supplemental Affidavit of Terri Hall (with attachments)." After reviewing the pleadings
and considering the admissible evidence of jurisdictional facts, the trial court granted TURF's
motion to supplement the record and granted TxDOT's plea to the jurisdiction.


Plea to the Jurisdiction


 On appeal, TURF argues that the trial court erred in granting TxDOT's plea to the
jurisdiction. Specifically, TURF argues that the trial court had jurisdiction over its claims under the
Uniform Declaratory Judgments Act (the UDJA) because Amadeo Saenz, the Executive Director of
TxDOT, and Coby Chase, the Director of the TxDOT Government and Public Affairs Division,
acted outside their legal authority by spending appropriated funds to hire a lobbyist and engaged in
lobbying and political activities designed to support the use of toll roads in Texas, including the
Trans-Texas Corridor, in violation of chapter 556 of the government code and the federal Hatch Act. 
See Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.009 (West 2008) (Uniform Declaratory
Judgments Act); Tex. Gov't Code Ann. §§ 556.001-.009 (concerning political activities by state
agencies and employees); 5 U.S.C. §§ 1501-08 (2007) (federal Hatch Act concerning political
activities of certain state and local employees). The UDJA allows a person "whose rights, status,
or other legal relations are affected by a statute" to "have determined any question of construction
or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal
relations thereunder." Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a).

 TURF has asserted ultra vires claims. See City of El Paso v. Heinrich, 284 S.W.3d
366, 372 (Tex. 2009). (3) "To fall within this ultra vires exception, a suit must not complain of a
government officer's exercise of discretion, but rather must allege, and ultimately prove, that the
officer acted without legal authority or failed to perform a purely ministerial act." Id. Because
TURF has alleged ultra vires claims, I construe the relevant statutory provisions in light of the
facts pleaded and evidence submitted by the parties to determine as a matter of law whether an
ultra vires act is in fact alleged. See id.; City of Rockwall v. Hughes, 246 S.W.3d 621, 625-26
(Tex. 2008) (rules of statutory construction discussed); Texas Dep't of Parks & Wildlife v. Miranda,
133 S.W.3d 217, 226-27 (Tex. 2004).


 A. Section 228.004


 Transportation code section 228.004 authorizes TxDOT "to promote the development
and use of toll projects." Tex. Transp. Code Ann. § 228.004 (West Supp. 2009). To carry out this
legislative mandate, section 228.004 expressly authorizes TxDOT to "engage in marketing,
advertising, and other activities" and to "enter into contracts or agreements necessary to procure
marketing, advertising, or other promotional services from outside service providers." Id. The plain
language of section 228.004 evidences a clear grant of discretion to TxDOT to promote the
development and use of toll projects by "engag[ing] in marketing, advertising, and other activities." 
Id.; see also City of Rockwall, 246 S.W.3d at 625-26.

 Contrary to TURF's allegations, the record reflects that the "Keep Texas Moving"
campaign was a public information program implemented by TxDOT to promote the development
and use of toll projects. Ms. Havelka averred that the Keep Texas Moving campaign was "a
statewide public information effort to inform and educate the public about improving the
transportation needs in Texas." To the extent TURF alleges that the sole purpose of the Keep Texas
Moving campaign was to advocate and promote the use of toll roads in Texas, including the
Trans-Texas Corridor, such allegations and purpose are consistent with the Legislature's approval
of toll roads in general--and more specifically the Trans-Texas Corridor in chapter 227 of the
transportation code--and TxDOT's authority to promote the development and use of toll projects
in section 228.004. See Tex. Transp. Code Ann. §§ 227.001-.083, 228.004 (West Supp. 2009). As a
matter of law TURF has failed to plead or present evidence creating a fact issue of an ultra vires act
with regard to section 228.004. See Heinrich, 284 S.W.3d at 372; Miranda, 133 S.W.3d at 227-28.

 

 B. Section 556.004


 Section 556.004 of the government code precludes a state agency from participating
in political activities such as using appropriated funds to support a candidate for office. See Tex.
Gov't Code Ann. § 556.004. TURF argues that the "Keep Texas Moving" campaign was a lobbying
campaign designed to achieve a political purpose in violation of section 556.004(c) because TxDOT
used the Keep Texas Moving campaign to achieve a political purpose. See id. § 556.004(c). (4) In
support of this argument, TURF points to evidence "that the campaign in question advances toll
roads and public-private partnerships as the only solution to Texas' transportation needs" and "uses
false information to advance toll roads as the only solution to Texas' transportation needs." Among
other things, TURF alleges that there is evidence of "overt political activities" such as "[p]urchasing
the 'keeptexasmoving.com' domain name from a pro-toll political organization" and "[h]iring
political consultants and lobbyists to craft pro-toll messages" for use on the Keep Texas Moving
website and in radio and television advertising.

 The principal question is what the Legislature intended when it barred state officials
and employees from using state programs to achieve a political purpose. See id. The statute does
not define the phrase "political purpose." See id. § 556.004. However, read in the context of the
entire provision as well as other provisions in chapter 556, section 556.004(c)'s prohibition against
using a program administered by a state agency "to achieve any other political purpose" does not
prohibit the type of public information effort exemplified by the Keep Texas Moving campaign. See
generally id. §§ 556.004-.006; see also Phillips v. Bramlett, 288 S.W.3d 876, 880 (Tex. 2009)
(courts should read statutes as a whole and interpret them to give effect to every part); Jones
v. Fowler, 969 S.W.2d 429, 432 (Tex. 1998) (same). Accordingly, I construe this prohibition to be
directed at preventing a state agency from using state programs and resources to influence the result
of an election or nomination of a candidate for public office or to influence the passage or defeat of
a legislative measure. See Tex. Gov't Code Ann. §§ 556.004(c), .006(a). Stated differently, section
556.004 precludes state agencies from engaging in partisan political activities. (5)

 Accepting all of TURF's allegations and evidence as true, nothing in the record
reflects that the Keep Texas Moving campaign was used in a manner prohibited by section 556.004. 
I would conclude as a matter of law that TURF has failed to plead or present evidence creating a fact
issue of an ultra vires act with regard to section 556.004. See Heinrich, 284 S.W.3d at 372;
Miranda, 133 S.W.3d at 227-28.


 C. Section 556.005


 The plain language of section 556.005(a) precludes a state agency from hiring a
person who is required to register as a lobbyist under chapter 305. Tex. Gov't Code Ann.
§ 556.005(a); City of Rockwall, 246 S.W.3d at 625-26. (6) The record reflects that TxDOT entered into
an agreement with the Rodman Company to provide services for the Keep Texas Moving campaign;
the Rodman Company used the services of Gary Bushell, LLP; and Gary Bushell, LLP, is
registered as a lobbyist under chapter 305 of the government code. The issue then is whether the
Rodman Company's use of services provided by Gary Bushell, LLP, violates the prohibition in
section 556.005(a) against state agency employment of a person who is required to register as a
lobbyist under chapter 305.

 Chapter 305 of the government code requires that a person who receives
compensation for communicating directly with members of the state legislative or executive branch
in order to influence legislation file a written statement of registration identifying the entities or
persons he represents and the amount of compensation received for his services. See Tex. Gov't
Code Ann. §§ 305.003-.005 (West 2005 & Supp. 2009). TURF alleges that Gary Bushell, LLP, was
hired to assist TxDOT "in seeking approval of local officials for tolling and the Trans-Texas
Corridor/I-69 toll road." Accepting TURF's allegations as true, I cannot conclude that
TxDOT's actions violated section 556.005 because the Rodman Company, not TxDOT, hired
Gary Bushell, LLP, and communicating with local officials--and conducting "town hall"
meetings--does not require registration under Chapter 305. On these facts, I cannot conclude that
TxDOT officials acted outside their authority under section 556.005 in hiring the Rodman Company,
who utilized the services of Gary Bushell, LLP, to communicate with local officials and conduct
town hall meetings in connection with the Keep Texas Moving campaign. I would conclude as a
matter of law that TURF has failed to plead or present evidence creating a fact issue of an ultra vires
act under section 556.005. See Heinrich, 284 S.W.3d at 372; Miranda, 133 S.W.3d at 227-28.

 

 D. Section 556.006


 Section 556.006 prohibits a state agency from using appropriated funds to attempt to
influence the passage or defeat of a legislative measure. Tex. Gov't Code Ann. § 556.006. (7) There
is nothing in the record to demonstrate that TxDOT officials used the Keep Texas Moving campaign
to influence the passage or defeat of a legislative measure. The Legislature enacted legislation
approving the concept of the Trans-Texas Corridor in 2003. See generally Tex. Transp. Code Ann.
§§ 227.001-.083. Thus, TxDOT officials could not have used the Keep Texas Moving campaign,
which was not developed until 2006 or implemented until late 2007, to influence the passage of
legislation in 2003. TURF has not alleged that the Keep Texas Moving campaign was used to
influence the passage or defeat of any other legislative measure. Moreover, the deposition testimony
from Ms. Havelka, the TxDOT employee who managed the Keep Texas Moving campaign, reflects
that it was a public information tool to educate the public about the use of toll roads and to encourage
the public to attend the public hearings regarding the use of toll roads. Chapter 227 of
the transportation code required TxDOT to hold public hearings and seek public input on
the development of the Trans-Texas Corridor. See id. § 227.013 (West Supp. 2009). In addition,
section 556.006(b) expressly provides that state officers or employees are not prohibited from using
state resources to provide public information or to provide information in response to a request. 
Tex. Gov't Code Ann. § 556.006(b). Under these circumstances and on this record, I would
conclude as a matter of law that TURF has failed to plead or present evidence creating a fact issue
of an ultra vires act in connection with section 556.006.

 

 E. Federal Hatch Act and Lobbying


 In support of its allegations that TxDOT officials have violated the federal Hatch Act,
TURF alleges that TxDOT officials "have directed the expenditure of public funds to lobby
the United States Congress in favor of a policy of expanding toll roads and tolling existing
interstate highways." TURF further alleges that "the Keep Texas Moving campaign and lobbying
campaign constitute state agency-sponsored political advocacy and lobbying that is prohibited by
§ 556.001 et seq. of the Texas Government Code and 5 U.S.C. [§] 1501 et seq." TURF argues that
such activities violate the federal Hatch Act and, more specifically, 5 C.F.R. § 151.121, which
provides that "[a] State or local officer or employee may not . . . [d]irectly or indirectly coerce,
attempt to coerce, command, or advise a State or local officer or employee to pay, lend, or contribute
anything of value to a political party, committee, organization, agency, or person for a political
purpose." See 5 C.F.R. § 151.121(b) (2010); see also Tex. Gov't. Code Ann. § 556.0055 (providing
restrictions on lobbying expenditures).

 As noted above, however, federal courts, including the United States Supreme Court,
have construed the federal Hatch Act narrowly to circumscribe only partisan political
activities--i.e., activities directed toward the success of a political party. See United States Civil
Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 568-74 (1973); Bauers v. Cornett,
865 F.2d 1517, 1524 (8th Cir. 1989). As explained by the Supreme Court in Letter Carriers, the
prohibition against political activity is not to be construed to prohibit political activity in nonpartisan
elections or in connection with questions not specifically identified with any national or state
political party, such as "questions relating to constitutional amendments, referendums, approval of
municipal ordinances, and others of a similar character . . . ." Letter Carriers, 413 U.S. at 562.

 Although TURF alleges that the Keep Texas Moving campaign constitutes lobbying
and political advocacy in violation of the federal Hatch Act, it does not allege that such activities are
partisan activities directed toward the success of a political party. Nor does TURF point to any
evidence in the record that suggests that TxDOT's activities, including the Keep Texas Moving
campaign, were directed toward the success of a political party. I conclude as a matter of law that
TURF has failed to plead or present evidence creating a fact issue of an ultra vires act on the part
of TxDOT officials in violation of the federal Hatch Act.

 With respect to its allegations that TxDOT officials have engaged in lobbying in
violation of chapter 556 of the government code, I likewise construe the restrictions in chapter 556
to be directed at partisan political activities. See id. Because TURF has not alleged that TxDOT
officials have engaged in partisan political activities directed toward the success of a political party,
I conclude that TURF has failed to allege an ultra vires act on the part of TxDOT officials in
violation of the lobbying restrictions in chapter 556 of the government code. Nor has TURF
presented evidence creating a fact issue of an ultra vires act in connection with the lobbying
restrictions in chapter 556 of the government code.

 Having reviewed the relevant statutory provisions in light of TURF's allegations and
concluded as a matter of law that TURF has failed to plead or present evidence creating a fact issue
of an ultra vires act on the part of TxDOT officials in developing and implementing the Keep Texas
Moving campaign to promote the development of toll projects, I conclude that TURF has not shown 

a waiver of sovereign immunity and, therefore, the trial court lacked jurisdiction over TURF's UDJA
claims and properly granted TxDOT's plea to the jurisdiction. (8)


Taxpayer Standing


 To the extent TURF asserts taxpayer standing to bring its claims against TxDOT, as
the majority observes, it is well settled that once a challenged expenditure has been made--even
assuming that the claim against such expenditure is meritorious--a complaining taxpayer no longer
has standing to sue. Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 556 (Tex. 2000). As the
supreme court explained in Bland, the justification for allowing taxpayer suits to enjoin the
performance of illegal agreements is that the interference posed by such suits is slight compared to
the protection afforded taxpayers from preventing the culmination of illegal agreements made by
public officials. Id. at 558. But, once the governmental entity has made the complained-of
expenditures, the balance of costs and benefits in allowing taxpayer suits shifts significantly. After
the expenditures have been made, allowing taxpayer standing to challenge those expenditures
threatens to interfere substantially with other taxpayers' settled expectations. Id.

 The record reflects that the Keep Texas Moving campaign originated during 2006
with creative development of the campaign. The media placement, advertising, and informational
website began airing to the public in June 2007. TURF filed suit in September 2007, four months 

after the launch of the public information effort. The work plan with Thompson Marketing and
media placement for the Keep Texas Moving campaign ended September 30, 2007, leaving only
repayment for these services to be made. Allowance of a taxpayer action to prohibit payment for
these services, which have already been rendered, threatens substantial interference with
governmental actions and other taxpayers' settled expectations. See id. at 556-57. Because standing
is a component of subject matter jurisdiction, I agree with the majority that the trial court properly
granted TxDOT's plea to the jurisdiction against TURF's claims of taxpayer standing. (9) See Texas
Ass'n of Bus. v. Texas Air Control Bd., 852 S.W.2d 440, 445 (Tex. 1993).

 Finding no error in the trial court's order granting TxDOT's plea to the jurisdiction
and denying TURF's motion for continuance, I concur in the majority's judgment affirming the trial
court's order.


 __________________________________________

 Jan P. Patterson, Justice


Before Justices Patterson, Pemberton and Waldrop

Filed: August 20, 2010
1. The named plaintiff in TURF's original petition was Executive Director Terri Hall. TURF
was substituted as the sole named plaintiff in the second amended petition filed on October 18, 2007.
2. The live pleadings before the trial court on March 20, 2008, were TURF's "Third Amended
Original Petition and Application for Injunctive Relief, Including Temporary Restraining Order" and
TxDOT's "Second Amended Plea to the Jurisdiction."
3. Because TURF has not shown a waiver of sovereign immunity against the Texas
Department of Transportation or the Texas Transportation Commission, I agree with the majority
that the trial court did not err by granting TxDOT's plea to the jurisdiction as to those state agencies. 
See City of El Paso v. Heinrich, 284 S.W.3d 366, 373 (Tex. 2009).
4. Section 556.004(c) of the government code provides:


 (c) A state officer or employee may not use official authority or influence or
permit the use of a program administered by the state agency of which the
person is an officer or employee to interfere with or affect the result
of an election or nomination of a candidate or to achieve any other
political purpose.


Tex. Gov't Code Ann. § 556.004(c) (West 2004).
5. This construction is similar to the federal courts' construction of the federal Hatch Act, see
United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 568-74 (1973)
(explaining Congress intended only a "general proscription against partisan activities" in the Hatch
Act), which I address more fully below.
6. Section 556.005(a) states:


 (a) A state agency may not use appropriated money to employ, as a regular
full-time or part-time or contract employee, a person who is required by
Chapter 305 to register as a lobbyist. Except for an institution of higher
education as defined by Section 61.003, Education Code, a state agency may
not use any money under its control to employ or contract with an individual
who is required by Chapter 305 to register as a lobbyist.


Tex. Gov't Code Ann. § 556.005(a) (West 2004). 
7. Section 556.006 provides:


 (a) A state agency may not use appropriated money to attempt to influence the
passage or defeat of a legislative measure.


 (b) This section does not prohibit a state officer or employee from using state
resources to provide public information or to provide information responsive
to a request.


Id. § 556.006.
8. Because I conclude the trial court lacked jurisdiction to consider TURF's claims, I agree
with the majority that we need not reach other arguments raised by TxDOT, including that the case
is moot.
9. The same analysis applies to TxDOT's expenditures for the "Forward Momentum" report
published in February 2007 and the work already performed by the Rodman Company with the
assistance of Gary Bushell, LLP.