

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00498-CR

LUIS MIGUEL HERNANDEZ                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

## FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 1331780D

----------

## OPINION

----------

A jury convicted Appellant Luis Miguel Hernandez of murder and assessed his punishment at fourteen years' confinement. The trial court sentenced him accordingly. In three points, Appellant challenges the sufficiency of the evidence to support the verdict and argues that the trial court reversibly erred by including a jury instruction on provoking the difficulty and by overruling his objection to the State's use of a racial slur in final argument. Although the evidence is sufficient

to support Appellant's conviction, the trial court reversibly erred by overruling his objection to the State's final argument. We, therefore, reverse the trial court's judgment and remand this case to the trial court.

**Brief Facts**

Quionecia Barber was visiting Devin Toler, the complainant, and their nineteen-month-old daughter in an upstairs apartment at the Wildwood Branch apartment complex. Toler was engaged in a sexual relationship with Mary, his boss at the Subway Shop where he worked. Mary lived downstairs with her husband, Appellant, and their children. Mary and Toler's relationship had become common knowledge, and Appellant reacted with growing anger toward Toler, yelling at him whenever he saw him. Toler was taller than Appellant. But Toler's mother was concerned and told him to call the police and not to go outside alone.

On the day Toler was killed, Appellant took a small bag of trash to the dumpster. When he saw Toler on the basketball court, Appellant started yelling at him. Toler got upset and started to walk toward Appellant. Quionecia yelled at the men to stop because her daughter was there. At trial, Quionecia testified that Appellant said, "Fuck that bitch, no one cares about her." While Quionecia testified that she remembered telling the police what Appellant had said about her daughter, she also admitted that the audiotape of her interview with the police recorded on the night Toler was killed did not include that information.

Toler left the basketball court, ran toward Appellant, and started to fight.

2

When the fight began, the little girl ran off, and Quionecia went to get her. When Quionecia came back to the men, from her angle, it looked like Toler was hitting more. When the fight ended, Appellant walked toward his apartment, and Toler fell to the ground. Quionecia ran to him and saw a gash above his left chest.

Appellant came back outside and said, "This is what happens when you mess with me." His children and Mary got in the car and left. Then Appellant went over to Toler and Quionecia, knelt and put water from a water bottle on Toler's face, and asked him to get up. Appellant said he was sorry and that it should not have gone that far. He said, "I'm sorry, he was choking me. I didn't have a choice."

Appellant had a knife during the offense. Although it is referred to as a *butter knife* in the record, it was actually a *place knife* or *table knife*. "A **table knife** is an item of cutlery with a single cutting edge, and a blunt end—part of a **table setting**. Table knives are typically of moderate sharpness only, designed to cut prepared and cooked food."[1]

A butter knife, on the other hand, is much smaller.

> [A] butter knife (or *master butter knife*) is a sharp-pointed, dull-edged knife, often with a sabre shape, used only to serve out pats of butter from a central butter dish to individual diners' plates. Master butter knives are not used to spread the butter onto bread . . . . Individual butter knives have a round point, so as not to tear the bread, and are

---

[1]*Table knife*, Wikipedia, The Free Encyclopedia, https://en.wikipedia.org/wiki/Table_knife (last visited Oct. 21, 2016)

3

sometimes termed **butter spreaders**.[2]

State's Exhibit 8 is a photograph of the knife. It is clearly a table knife or place knife. To avoid confusion, we shall refer to it simply as a knife.

**Sufficiency of the Evidence**

In his first point, Appellant argues that the evidence is insufficient to support the jury's verdict because the evidence of self-defense precluded his conviction.[3] A defendant has the burden of producing some evidence to support a claim of self-defense.[4] The State has the burden of persuasion in disproving self-defense.[5] This burden does not require the State to produce evidence refuting the self-defense claim; rather, the burden requires the State to prove its case beyond a reasonable doubt.[6] Self-defense is an issue of fact to be determined by the jury.[7] A jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory.[8]

In reviewing the sufficiency of the evidence to support the jury's rejection of

---

[2]*Butter knife*, Wikipedia, The Free Encyclopedia, https://en.wikipedia.org/wiki/Butter_knife (last visited Oct. 21, 2016).

[3]*See* Tex. Penal Code Ann. §§ 9.31–.32 (West 2011).

[4]*Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003).

[5]*Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991).

[6]*Id.*

[7]*Id.* at 913–14.

[8]*Id.* at 914.

Appellant's self-defense theory, we examine all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of murder and also could have found against him on the self-defense issue beyond a reasonable doubt.[9]

The State argues that the evidence of self-defense is inadequate because Appellant did not testify but relied on the testimony of others who did not support his self-defense claim. Appellant was not required to testify in order to rely on a self-defense justification.[10] Quionecia told the police that Appellant had told her that Toler had been choking him and that he had had no choice but to stab Toler. Appellant sufficiently raised the issue of self-defense.[11] But the fact that he sufficiently raised the issue so that he could rely on that issue does not mean he will necessarily prevail.[12]

The State relied, at least in part, on evidence provoking the difficulty to defeat Appellant's self-defense claim. When a defendant has spoken words reasonably calculated to provoke the complainant's attack on the defendant, the provocation doctrine may preclude the assertion of the self-defense justification

---

[9]*See id.*

[10]*See Smith v. State*, 676 S.W.2d 584, 586–87 (Tex. Crim. App. 1984); *Stoffregen v. State*, Nos. 02-03-00022-CR, 02-03-00023-CR, 2004 WL 362272, at *1 (Tex. App.—Fort Worth Feb. 26, 2004, no pet.) (mem. op., not designated for publication).

[11]*See Zuliani*, 97 S.W.3d at 594.

[12]*See Saxton*, 804 S.W.2d at 913–14.

5

or may support a jury's finding defeating the self-defense claim.[13]

The jury, as trier of fact, was free to believe that Appellant's words were insufficient to provoke the difficulty, that Toler's response was excessive in light of the provocation, that Appellant's words were sufficient to provoke the difficulty, that Toler's response was not excessive in light of the provocation, or that Appellant's response to Toler's attack was excessive because he met non-deadly force with deadly force. The jurors were also free to consider that Appellant had a knife on his person.[14]

Applying the appropriate standard of review, we hold the evidence sufficiently supported the jury's verdict. We overrule Appellant's first point.

**Jury Instruction on Provoking the Difficulty**

In his second point, Appellant contends that the trial court erred by overruling his requested charge and applying the law of provocation. In our review of a jury charge, we first determine whether error occurred; if error did not occur, our analysis ends.[15]

When the evidence raises, and the jury is charged on, self-defense, a charge on provocation is also required when there is sufficient evidence that (1)

---

[13]*See Elizondo v. State*, 487 S.W.3d 185, 196–204 (Tex. Crim. App. 2016); *Smith v. State*, 965 S.W.2d 509, 512–14 (Tex Crim. App. 1998); *Dyson v. State*, 672 S.W.2d 460, 463–65 (Tex. Crim. App. 1984).

[14]*See* Tex. Penal Code Ann. §§ 9.31–.32.

[15]*Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012).

the defendant provoked the attack on him, (2) the defendant's actions or words were reasonably calculated to provoke the attack, and (3) the defendant's actions or words were a pretext for inflicting harm on the other person.[16]

For the reasons discussed in our consideration of the sufficiency of the evidence, we hold that there was sufficient evidence from which a rational juror could find all the elements of provocation beyond a reasonable doubt, viewing the evidence in the light most favorable to giving the provocation instruction.[17] We therefore hold that the trial court did not err by instructing the jury on provoking the difficulty.  We overrule Appellant's second point.

**Racial Slur in the State's Final Argument**

In his third point, Appellant argues that

the trial court judge reversibly erred and abused its discretion in overruling . . . Appellant's objection to the prosecutor's inflammatory use of the racial slur "niggas[,]" which was outside the record of the case and had been urged intentionally and was manifestly designed to deny the appellant a fair jury trial during the State's closing jury argument at the end of the guilt-innocence phase of the appellant's trial.

After the police arrived, Appellant told Detective Pate that he had confronted Toler and had used "racial slurs . . . and cuss words" toward him because of "a prior altercation and prior confrontations they had had."  Toler

---

[16]*Smith*, 965 S.W.2d at 513; *see also* Tex. Penal Code Ann. § 9.31(b)(4); *Reeves v. State*, 420 S.W.3d 812, 816–20 (Tex. Crim. App. 2013) (analyzing preserved error in provocation instruction within the "six-page impenetrable forest of legal 'argle-bargle'").

[17]*Smith*, 965 S.W.2d at 514.

moved toward Appellant and hit him two, three, or four times in the face. Then, according to Appellant, Toler began choking him. Appellant admitted that he had then pulled a knife out of his front left pocket, a knife he claimed he had taken out of the trash, and he began to swing the knife backwards over his left shoulder, stabbing Toler.

In final argument, the prosecuting attorney said,

> What were the words of provocation? I'll tell you what the words of provocation were. [Appellant] called Devin and his family "niggas." That's what it was.

Proper jury argument falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; and (4) a plea for law enforcement.[18] Generally, error resulting from improper jury argument is subject to a harm analysis.[19]

To preserve a complaint about improper jury argument for appellate review, the defendant should (1) make a timely and specific objection, (2) request an instruction to disregard if the objection is sustained, and (3) move for a mistrial if the instruction to disregard is granted.[20] Appellant made a timely objection, and the trial court overruled the objection before the jury twice. After a bench

---

[18]*Davis v. State*, 329 S.W.3d 798, 821 (Tex. Crim. App. 2010), *cert. denied*, 132 S. Ct. 128 (2011).

[19]*See Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011), *cert. denied*, 132 S. Ct. 1099 (2012).

[20]*Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007); *see* Tex. R. App. P. 33.1(a).

conference, the trial court sustained the objection and instructed the jury, "Disregard the comment of Counsel." The trial court did not specify which comment of counsel he referred to and gave no further instruction. The prosecuting attorney immediately resumed argument, and Appellant failed to request a mistrial. Appellant raised the improper argument in his motion for new trial, which was denied.

In the past, our courts recognized that some jury arguments are so inflammatory that the harm and prejudice they cause cannot be cured by an instruction.[21] Then our courts, still recognizing the incurable nature of the prejudice, nonetheless declared that the injury could be waived by failure to move for a mistrial.[22]

Logically, this position makes no sense. An incurably prejudicial argument requires a mistrial.[23] If the trial court does not grant the mistrial, the court has committed error that requires setting aside the conviction and re-trying the case.[24] Respectfully, if the argument is so prejudicial that it has deprived the

---

[21] *See Willis v. State*, 785 S.W.2d 378, 385 (Tex. Crim. App. 1989), *cert. denied*, 498 U.S. 908 (1990), *overruled by Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996), *cert. denied*, 520 U.S. 1173 (1997); *cf. Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009).

[22] *Cockrell*, 933 S.W.2d at 89.

[23] *Pierson v. State*, 426 S.W.3d 763, 774–75 (Tex. Crim. App.), *cert. denied*, 135 S. Ct. 206 (2014).

[24] *Id.*

9

defendant of a fair trial, the injury is fundamental.[25] If the case is a civil case, denial of a fair trial results in setting aside the verdict, even if the complaint is not properly preserved at trial and raised for the first time in a motion for new trial.[26] Yet, a civil case does not involve loss of life or liberty. An unfair trial, even in a criminal case, does not become fair just because the request for a new trial comes on appeal rather than at trial. The reason for preservation of a complaint is to allow the trial court to assuage the harm—to correct the problem.[27] But when the injury is of such magnitude that the trial court cannot correct it, how can we find waiver because the trial court was not given the opportunity to "fix" the unfixable problem? Our courts, however, seem to insist that it is not the incurable prejudice that requires reversal of a conviction; rather, only an improper trial court ruling mandates reversal:

> The other two methods of complaint [besides objecting] are corrective measures. An instruction to disregard attempts to cure any harm or prejudice resulting from events that have already occurred. Where the prejudice is curable, an instruction eliminates the need for a mistrial, thereby conserving the resources associated with beginning the trial process anew. Like an instruction to disregard, a mistrial serves a corrective function. However, the class of events that require a mistrial is smaller than that for which a sustained objection or an instruction to disregard will suffice to prevent or correct the harm. A grant of a motion for mistrial should

---

[25] *Marin v. State*, 851 S.W.2d 275, 281–82 (Tex. Crim. App. 1993).

[26] *Phillips*, 288 S.W.3d at 883 (citing Tex. R. Civ. P. 324(b)(5)).

[27] *Hull v. State*, 67 S.W.3d 215, 217 (Tex. Crim. App. 2002); *see also Grado v. State*, 445 S.W.3d 736, 743 (Tex. Crim. App. 2014) (Keller, P.J., dissenting).

10

be reserved for those cases in which an objection could not have prevented, and an instruction to disregard could not cure, the prejudice stemming from an event at trial—i.e., where an instruction would not leave the jury in an acceptable state to continue the trial. Therefore, a mistrial conserves the resources that would be expended in completing the trial as well as those required for an appeal should a conviction occur.

Because the objection, the request for an instruction to the jury, and the motion for mistrial seek judicial remedies of decreasing desirability for events of decreasing frequency, the traditional and preferred procedure for a party to voice its complaint has been to seek them in sequence—that is, (1) to object when it is possible, (2) to request an instruction to disregard if the prejudicial event has occurred, and (3) to move for a mistrial if a party thinks an instruction to disregard was not sufficient. However, this sequence is not essential to preserve complaints for appellate review. The essential requirement is a timely, specific request that the trial court refuses.[28]

In 2007, courts recognized that some arguments are so prejudicial and so inflammatory that an instruction to disregard is inadequate:

We have previously said that while the "traditional and preferred procedure" for a party to preserve error is to (1) object in a timely manner, (2) request an instruction to disregard, and (3) move for mistrial if the instruction to disregard seems insufficient, such a sequence is not essential to preserve complaints for appellate review. The only essential requirement to ensure preservation is a timely, specific request that is refused by the trial court.

A request for an instruction to disregard is essential to the preservation of error only when such an instruction could have had the effect desired by the requesting party. If such an instruction would not be sufficient—that is, if the harm caused by the objectionable statements is incurable—then the defendant is entitled to a mistrial, and the denial of the motion for mistrial is sufficient by itself to preserve error for appellate review. When, as in this case, the appellant moved for mistrial without delay, even though the

---

[28] *Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004) (footnotes omitted).

11

motion was not preceded by an instruction to disregard, appellate review is limited to whether the trial court erred in denying the motion for mistrial.[29]

Here, there was no mention of the word "nigga" or any variation thereof in any of the testimony. Yet, the prosecutor argued that Appellant had called both Toler and his family "niggas." A prosecutor may not use closing arguments to present evidence that is outside the record.[30] Improper references to facts that are neither in evidence nor inferable from the evidence are generally designed to arouse the passion and prejudice of the jury and, as such, are inappropriate.[31]

The unique nature of the record before us is important to the analysis of this issue. During the State's final argument on guilt, the prosecuting attorney argued,

| [Prosecutor]: | Thank you, Judge, Counsel. What were the words of provocation? I'll tell you what the words of provocation were. Luis called Devin and his family "niggas." That's what it was. |
| --- | --- |
| [Defense Counsel]: | Your Honor, objection. That is certainly outside the record. That is not in the record at all. |
| THE COURT: | The jury will recall the testimony. |
| [Defense Counsel]: | No, Your Honor. That is not in the record. It is simply not there. |

---

[29]*Cruz*, 225 S.W.3d at 548 (footnotes omitted).

[30]*Freeman*, 340 S.W.3d at 728.

[31]*Id.*

THE COURT:            Overruled.

[Defense Counsel]:    Can I ask where that is in the record?

THE COURT:            Overruled.

[Defense Counsel]:    Wow.

THE COURT:            Come up, [Defense Counsel].  Come up.

A bench conference followed this exchange.  The jury was not privy to the discussion at the bench.  Then, the proceedings switched to open court.

THE COURT:            All right.  Ladies and gentlemen, I will sustain the objection.

[Defense Counsel]:    Ask the jury be instructed to disregard the comment of Counsel.

THE COURT:            Disregard the comment of Counsel.

The last thing the jury heard before the lengthy discussion at the bench was defense counsel's testy responses to the trial court.  Whose objection did the jury believe the trial court sustained?  Although defense counsel requested the instruction to disregard the comment of counsel, and it seems logical that it was the prosecutor's comment that the jury was instructed to disregard, defense counsel's request could equally be seen as an apology to the bench and a request that the jury be instructed to disregard defense counsel's exchange with the bench.  And by the time the jury was instructed, there had been numerous comments by both lawyers.

The impact of the improper statement by the prosecuting attorney must be viewed in the context of the political atmosphere at the time of trial.  The trial took

13

place in early December 2014. On February 26, 2012, George Zimmerman, whose mother was from Peru, killed Trayvon Martin. Emotional discussions of Zimmerman's ethnicity filled news commentary.[32] Other killings made headlines. Among them was the death of Eric Garner while he was selling loose cigarettes in New York on July 17, 2014. The officer who killed him was Daniel Pantaleo.[33] On August 9, 2014, Michael Brown was killed in Ferguson, Missouri.[34] On August 11, 2014, Ezell Ford was killed in Los Angeles by two police officers, one of whom was Hispanic.[35] And on November 23, 2014, twelve-year-old Tamir Rice was killed in Cincinnati, Ohio.[36] Additionally, the Black Lives Matter organization was formed in 2013 in response to the acquittal of George Zimmerman in his trial for the murder of Trayvon Martin and was actively

---

[32] *CNN's "White Hispanic" Label for George Zimmerman Draws Fire*, Huffington Post (July 12, 2013, 5:59 p.m.), http://www.huffingtonpost.com/ 2013/07/12/cnn-white-hispanic_n_3588744.html (last visited Oct. 25, 2016).

[33] *Death of Eric Garner*, Wikipedia, The Free Encyclopedia, https://en.wikipedia.org/wiki/Death_of_Eric_Garner (last visited Oct. 25, 2016).

[34] *Shooting of Michael Brown*, Wikipedia, The Free Encyclopedia, https://en.wikipedia.org/wiki/Shooting_of_Michael_Brown (last visited Oct. 25, 2016).

[35] *Shooting of Ezell Ford*, Wikipedia, The Free Encyclopedia, https://en.wikipedia.org/wiki/Shooting_of_Ezell_Ford (last visited Oct. 25, 2016).

[36] *Shooting of Tamir Rice*, Wikipedia, The Free Encyclopedia, https://en.wikipedia.org/wiki/Shooting_of_Tamir_Rice (last visited Oct. 25, 2016).

involved in protests nationwide.[37]

Appellant's statement that he had used a racial slur toward Toler was vague. Quionecia gave no indication that she had heard anything that she considered a racial slur. The prosecutor's addition to the dialogue that Appellant had called Toler and his family "niggas", in the context of the racial conflicts throughout the country, was particularly inflammatory. The trial judge was obligated to provide clear, unequivocal instruction to the jury: to clearly state what objection he had sustained and to clearly and specifically instruct the jury to disregard the prosecutor's unsupported statement that Appellant had called both Toler and his family "nigga."[38]

Although the trial judge twice overruled Appellant's objection to the prosecutor's statement outside the record that injected inflammatory and prejudicial speculation into the record as fact, when the objection was made clear in a bench conference, the conscientious trial judge sustained it. Unfortunately,

---

[37]Julia Craven, *Black Lives Matter Co-Founder Reflects on the Origins of the Movement*, Huffington Post (Sept. 30, 2015, 3:19 p.m.), http://www.huffingtonpost.com/entry/black-lives-matter-opal-tometi_us_560c1c59 e4b0768127003227 (last visited Oct. 25, 2016).

[38]S*ee, e.g.*, *Austin v. State*, 222 S.W.3d 801, 813–16 (Tex. App.—-Houston [14th Dist.] 2007, pet. ref'd) (holding trial court did not abuse its discretion in trial of mother for felony injury to child when, after grandmother testified that she had been concerned about leaving a child with mother or suspicious of her when another of mother's young children had died—evidence which had been the subject of a motion in limine, the trial court strongly instructed the jurors three times that day and polled them individually the next day about whether they could follow the instruction to disregard), *cert. denied*, 552 U.S. 1191 (2008).

so much had occurred outside the presence of the jury that it was unclear to the jury what objection had been sustained. Additionally, the experienced trial judge gave a perfunctory instruction to disregard, rather than a clear and forceful instruction to disregard the prosecutor's inflammatory statement that was outside the record. The conscientious trial judge may not have wanted to call more attention to the improper argument. But, under the facts of this case, it was important that the instruction be clear, rather than vague, and forceful, rather than perfunctory.

For these reasons, we hold that Appellant's complaint was adequately preserved, both at trial and in his motion for new trial, and we further hold that the harm caused by the prosecutor's inflammatory statement outside the record could not be cured by the vague and perfunctory instruction to disregard. We, therefore, sustain Appellant's third point.

**Conclusion**

Having overruled Appellant's first two points but having sustained his third point, we reverse the trial court's judgment and remand this case to the trial court for proceedings consistent with this opinion.

16

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, WALKER, and SUDDERTH, JJ.

WALKER, J., filed a concurring opinion.

SUDDERTH, J., filed a dissenting opinion.

PUBLISH

DELIVERED:  November 3, 2016